|  |  |
|---|---|
| **LEON MCBURROWS,** | Civ. No. 15-cv-6321 |
| **Plaintiff,** | |
| **v.** | **OPINION** |
| **VERIZON, et al.,** | |
| **Defendants.** | |

**MCNULTY, U.S.D.J.:**

The plaintiff, Leon McBurrows, asserts claims against Verizon Employee Benefits Committee ("VEBC") and the Verizon Claims Review Committee ("VCRC") (together, the "Plan Committees") under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001, *et. seq.*, for the alleged wrongful denial of disability benefits. Mr. McBurrows also asserts claims against Verizon New Jersey, Inc. ("Verizon")[1] under the New Jersey Law Against Discrimination ("NJLAD"), N.J. Stat. Ann. § 10:5-12.

Now before the Court is the motion of the Plan Committees for summary judgment pursuant to Fed. R. Civ. P. 56. (DE 74).[2] For the reasons expressed herein, I will grant the Plan Committees' motion for summary judgment.

---

[1]    Defendant states that this is the correct name of the entity sued as "Verizon" or "Verizon Communications Inc." MetLife Insurance Company, originally named as a defendant, was dismissed without prejudice by consent order. (DE 20)

[2]    Record items will be abbreviated as follows. Citations to page numbers refer to the page numbers assigned through the Electronic Court Filing system, unless otherwise indicated.

  "DE _" =          Docket Entry number in this case

  "2AC ¶ _" =       Second Amended Complaint (DE 53)

## I.    SUMMARY

### A. Procedural History

Mr. McBurrows originally filed this action in state court against, among others, Verizon. The defendants removed the case to federal court because claims based on the denial of disability and health insurance benefits are preempted by ERISA, see 29 U.S.C. §§ 1132 & 1144. The defendants then moved to dismiss the complaint on the grounds that it failed to state an ERISA claim. I filed a short order noting that the plaintiff had neither ERISA nor federal pleading standards in mind when he filed his state-court complaint, dismissing the complaint without prejudice, and granting leave to file an amended complaint. (DE 15). The plaintiff then filed his First Amended Complaint, which for the first time named the Plan Committees as defendants. (DE 16).

Defendants then moved to dismiss the First Amended Complaint. (DE 21; DE 23). In an Opinion dated February 17, 2017, I dismissed without prejudice the Count 1 NJLAD claim of disability discrimination, asserted against Verizon, for failure to state a claim. See Fed. R. Civ. P. 12(b)(6). (DE 33; DE 34). McBurrows v. Verizon, No. 15-CV-6321 (KM), 2017 WL 1243145, at *1 (D.N.J. Feb. 17, 2017). With respect to the ERISA claims, I denied the motion to dismiss, holding that the asserted defenses "relie[d] on facts extrinsic to the complaint" and were therefore "best considered in connection with a motion for summary judgment." Id.

Magistrate Judge Dickson granted plaintiff's motion for leave to file a Second Amended Complaint. (DE 52). Mr. McBurrows then filed his Second Amended Complaint, which is the currently operative pleading. (DE 53).[3] Counts 3, 4, and 5 assert ERISA claims against the Plan Committees. Now before the Court is the motion of the Plan Committees for summary judgment pursuant to Fed. R. Civ. P. 56. (DE 74).

---

[3]     In the Second Amended Complaint, the paragraph numbering starts anew for each count. In citations, I will refer to the Count number and the paragraph number. For example, "2AC 2 ¶ 1" means Second Amended Complaint Count 2, paragraph 1.

### B. Facts

From approximately 1986 through June 2015, Mr. McBurrows was employed by Verizon at various locations in New Jersey. (DE 79-2 at 4; DE 16-2 at 21). Mr. McBurrows seeks, as against the Plan Committees, short term disability ("STD") and long term disability ("LTD") benefits under Verizon's Plan for Group Insurance (the "Plan"). The parties do not dispute that the Plan is an employee benefit welfare plan governed by ERISA and that Mr. McBurrows was a participant in the Plan while employed by Verizon.

The Plan document is entitled "Your Disability Coverage Verizon January 1, 2011." (DE 75 ¶ 2; DE 79-1 ¶ 2; DE 74-3 at 4). As to STD coverage, the Plan explains that an eligible Verizon employee is "automatically enrolled for STD coverage" on his or her first day of work, but that one "must enroll for LTD coverage." (DE 74-3 at 7, 12; DE 75 ¶ 7; DE 79-1 ¶ 7). If one is enrolled and approved for LTD coverage, LTD benefits are payable when STD benefits end, assuming one meets the Plan's definition of totally disabled. (Id.).

Mr. McBurrows suffered from certain medical ailments that worsened in August 2013 and thereafter. (DE 79-2 at 4). Due to those health complications, Mr. McBurrows went on short term leave from Verizon in August 2013 and received STD benefits under the Plan during that time. (DE 79-2 at 4). On June 17, 2014, Verizon sent Mr. McBurrows a letter explaining that his STD benefits expired on May 24, 2014, and that if he did not return to work he would be deemed to be "on an unauthorized absence." (DE 16-2 at 4, 27). After Mr. McBurrows's counsel successfully appealed this STD benefits determination, his STD benefits were extended to August 12, 2014. (DE 16-2 at 33, 36).

Meanwhile, on July 14, 2014, Mr. McBurrows returned to work at Verizon, although at a different location in New Jersey. His job duties changed, and instead of full time, he worked "shortened days." (2AC 1 ¶ 7; DE 16-2 at 16). Thereafter, on October 6, 2014, he was placed on unpaid personal leave. (DE 16-2 at 17).

On June 25, 2015, Verizon sent Mr. McBurrows a letter stating that his unpaid leave of absence expired on June 5, 2015, and that Verizon had been

3

made aware that he was unable to return to work following that date. (DE 16-2 at 21). The June 25, 2015 letter informed Mr. McBurrows that his request for an extension of the unpaid leave was denied and that Verizon considered Mr. McBurrows to have abandoned his position. (*Id.*). Verizon officially terminated his employment on June 25, 2015. (*Id.*).

Mr. McBurrows did not receive LTD benefits in the relevant period described above. Mr. McBurrows did not submit a claim for LTD benefits to the Plan Committees. Instead he filed the present lawsuit as described in the procedural history above. (DE 75 ¶ 14; DE 79-1 ¶ 14).

Mr. McBurrows's enrollment history for LTD benefits is as follows. He had varying amounts of LTD coverage through Verizon for each year from 2002 through the end of 2006. (DE 74-30 at 57–58; DE 79-2 at 8–9). A Verizon historical LTD enrollment record shows that he did not elect to have any LTD coverage for the years 2001, 2007, 2008, 2009, 2010, 2011, and 2012. (*Id.*). That enrollment record is silent as to the years before 2001 and after 2012. (*Id.*).

A 2014 Annual Enrollment Confirmation Statement, documenting Mr. McBurrows's coverage elections as of November 2013, indicates that he did not have any LTD coverage in 2013. (DE 74-12 at 76; DE 75 ¶ 21; DE 79-1 ¶ 21). That document shows that in November 2013, Mr. McBurrows did elect to enroll in LTD coverage for the following year, but that such 2014 LTD coverage was "[p]ending [e]vidence of insurability." (*Id.*).

On June 1, 2015, MetLife sent a letter to Mr. McBurrows that noted his STD benefits exhausted on August 12, 2014. That letter referred to a recent notice sent to Mr. McBurrows confirming that he was not currently enrolled for LTD coverage. (DE 74-26 at 40). On June 5, 2015, Verizon also sent Mr. McBurrows a letter which referred to MetLife's recent notice confirming that he was not enrolled in LTD coverage with Verizon. (DE 74-29 at 42; DE 75 ¶ 13; DE 79-1 ¶ 13).

4

The June 5, 2015 letter from Verizon additionally noted that MetLife's records indicated that any LTD coverage Mr. McBurrows previously had with Verizon expired around January 2011. (*Id.*). The Plan Committees contend that this is was an error; Mr. McBurrows, they say, was not enrolled for LTD coverage at any time subsequent to 2006. (DE 75 ¶ 13).

On August 2, 2017, Verizon sent a letter to Mr. McBurrows's counsel explaining that VCRU issued a claim determination that Mr. McBurrows "sought enrollment for LTD coverage on October 31, 2013, via the BenefitsConnection website when making 2014 calendar year annual enrollment elections." (DE 74-8 at 13; DE 75 ¶ 22). Overall, VCRU concluded that Mr. McBurrows "was not enrolled for or eligible to participate in the LTD coverage under the Plan" and that he "had not been enrolled for LTD coverage since 2006 when coverage became subject to employee-paid premiums." (*Id.*).

In the August 2, 2017 letter, Verizon also noted that in October 2013, while Mr. McBurrows was receiving STD benefits, he attempted to enroll in LTD coverage. (*Id.*). VCRU explained the reasons why it believed Mr. McBurrows was not entitled to LTD under those circumstances:

> [E]nrollment for LTD coverage under the Plan is predicated on submission of evidence of insurability to MetLife, acceptance of evidence of insurability by MetLife, payment of required premiums and return to active employment for a minimum of 90 days after STD.

> Benefits Center records indicate that Mr. McBurrows never submitted the required evidence of insurability. As a result, evidence of insurability was never accepted by MetLife and he was not enrolled for LTD coverage under the Plan. Moreover, he did not pay premiums for LTD coverage. Additionally, he did not return to active employment for a period of 90 consecutive days after his return from STD.

> Despite the fact that Mr. McBurrows failed to satisfy the requirements for enrollment for LTD coverage as noted above, the Verizon Claims Review Unit consulted with MetLife to determine whether a submission of evidence of insurability by Mr. McBurrows would have been accepted by MetLife as required under the Plan.

> Evidence of insurability requires the submission of the enclosed Statement of Health Form. MetLife has determined that if Mr. McBurrows had completed the Statement of Health Form, yes answers would have been required to items 11b.,11k., and 11t [relating to whether a pre-

existing medical condition exists]. MetLife has indicated that yes responses to these items would have resulted in MetLife's determination that the evidence of insurability was unacceptable (a copy of that opinion is also enclosed). As a result, coverage and enrollment would also have been denied on the basis of insurability.

(DE 74-8 at 15–16; DE 75 ¶ 22; DE 79-1 ¶ 22).

On January 24, 2018, Mr. McBurrows appealed the LTD claim determination to the VCRC. (DE 75 ¶ 23; DE 79-1 ¶ 23). Kevin Cammarata, the Chairperson of the VCRC, considered the appeal and whether Mr. McBurrows was eligible for LTD coverage under the Plan. (DE 75 ¶ 24; DE 79-1 ¶ 24). The VCRC issued a final determination on April 30, 2018, and concluded that Mr. McBurrows was ineligible for LTD coverage because (1) he did not submit evidence of insurability to MetLife; (2) he did not pay the required premiums for LTD coverage; and (3) he did not return to full-time employment for a minimum of 90 days following receipt of his STD benefits. (DE 74-27 at 62–66; DE 75 ¶ 25; DE 79-1 ¶ 25). Moreover, even if MetLife had received his evidence of insurability, that evidence would have established that he was not eligible for coverage, because he had a pre-existing medical condition. (*Id.*).

### i. LTD Coverage under the Plan

The Plan sets forth the following applicable provisions with respect to enrolling for LTD coverage:

**Enrolling**
You must enroll in the LTD plan in order to be eligible for LTD coverage.
. . .
You can enroll for LTD coverage within 31 days of your hire date. If you enroll for LTD coverage during the initial 31-day period, you will not need to provide evidence of insurability for coverage to take effect. Evidence of insurability is a statement of your medical health that MetLife will use to determine if you are approved for LTD coverage.

**During the year**
You can enroll for LTD coverage at any time during the year, including during annual enrollment. However, you will need to provide evidence of insurability to MetLife, and that evidence must be accepted, before coverage can take effect.

**If you do not enroll**
You will receive "no coverage" for LTD if you do not enroll.

**Paying for coverage**

You pay the cost of LTD coverage through after-tax payroll deductions, which provides the advantage of tax-free LTD benefits. Your contributions for coverage are based upon your annual benefits compensation as of July 1 of the previous calendar year and the LTD coverage option you choose. If you are on an approved leave of absence, you are required to continue paying for your LTD premiums.

. . .

**When coverage begins**

. . .

**If you do not enroll when first eligible**

You can enroll in LTD coverage at any time throughout the year - as well as during any annual enrollment period - but you will need to provide evidence of insurability to MetLife, and that evidence must be accepted, before your coverage can take effect.

Coverage begins on the first day you are actively at work that is on or after the day that your evidence of insurability is accepted.

**If you are disabled when you enroll**

If you are receiving STD benefits when you enroll for LTD coverage, your elected coverage cannot take effect until you actively return to work on a full-time basis and are engaged continuously in the performance of your job for more than 90 consecutive days and provide evidence of insurability. Under no circumstances will your enrollment in the LTD plan take effect while you continue to be out on a short-term disability leave.

...

**About the LTD Plan**

...

Participation in the LTD Plan is optional. You can purchase coverage equal to 50% or 66-2/3% of your annual benefits compensation to protect yourself against income loss due to disabilities that last beyond the period of STD benefits.

(DE 74-3 at 27–30; DE 75 ¶¶ 2, 3; DE 79-1 ¶¶ 2, 3).

The Plan provides that VCRC is the claims administrator with respect to enrollment and eligibility claims and appeals. (DE 74-3 at 47; DE 75 ¶ 5; DE 79-1 ¶ 5). The Plan sets out the role of the claims administrator as follows:

**The claims administrator and its authority to review claims**

The Verizon Employee Benefits Committee (VEBC) has delegated its authority to finally determine claims to the Verizon Claims Review Committee (VCRC). In some cases, the VCRC will delegate the authority to finally determine claims to certain other organizations on behalf of

Verizon. Benefits under the disability income protection program are paid only if the VEBC, or its delegate, decides in its discretion that the applicant is entitled to them.

The claims administrator has:

- The authority to make final determinations regarding eligibility and benefit claims under the disability income protection program.

- Discretionary authority to:

  - Interpret the disability income protection program based on provisions and applicable law and make factual determinations about claims arising under the disability income protection program.

  - Determine whether a claimant is eligible for benefits.

  - Decide the amount, form and timing of benefits.

  - Resolve any other matter under the disability income protection program that is raised by a participant or a beneficiary or that is identified by the claims administrator.

In case of an appeal, the claims administrator's decisions are final and binding on all parties to the full extent permitted under applicable law, unless the participant or beneficiary later proves that the claims administrator's decision was an abuse of administrator discretion.

(DE 74-3 at 47–48; DE 75 ¶ 5; DE 79-1 ¶ 5).

The Plan also requires one to exhaust the appeals process described within the Plan before "bring[ing] any action at law or in equity to recover plan benefits." (DE 74-3 at 50; DE 75 ¶ 6; DE 79-1 ¶ 6). That appeal must be "finally decided by MetLife", to which the VCRC "has delegated its authority to finally determine claims" as the claims fiduciary. (*Id.*).

### ii. STD Coverage and Mr. McBurrows' Eligibility

A Verizon employee can receive STD benefits if he or she is "actively at work and become[s] totally disabled." (DE 75 ¶ 8; DE 79-1 ¶ 8). The amount of STD benefits will either be 100% or 60% of the employee's pay, depending on the employee's years of service. (*Id.*). Mr. McBurrows was eligible for the maximum STD benefit period of 52 weeks. (*Id.*).

Mr. McBurrows' claim for STD benefits was approved, and he started to receive STD benefits on August 14, 2013. (DE 75 ¶¶ 9, 12; DE 79-1 ¶¶ 9, 12). In a letter dated June 17, 2014, MetLife—the claims administrator for benefits

claims—informed Mr. McBurrows that his STD claim terminated on May 25, 2014 based on MetLife's determination that the "medical [records] reviewed does not support a level of functional impairment that would prevent [Mr. McBurrows] from performing the sedentary duties of [his] own sedentary job." (*Id.*). However, on July 23, 2014, Mr. McBurrows's counsel appealed the STD claim determination and submitted additional supporting documents in October and December 2014. (DE 75 ¶ 10; DE 79-1 ¶ 10). Mr. McBurrows did not appeal or otherwise contest the amount of the monthly STD benefits he received or was eligible to receive. (*Id.*).

On February 26, 2015, MetLife told Mr. McBurrows that the previous claim determination would be reversed, and that his STD benefits would be reinstated. (DE 74-26 at 28; DE 75 ¶ 11; DE 79-1 ¶ 11). On June 1, 2015, MetLife notified Mr. McBurrows that he had exhausted his STD benefits, in that the 52 weeks of coverage had maxed out as of August 12, 2014. (DE 74-26 at 40; *see also* DE 74-29 at 42). Mr. McBurrows did not otherwise appeal from any determination regarding his STD coverage.

## II.    LEGAL STANDARD

Federal Rule of Civil Procedure 56(a) provides that summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Kreschollek v. S. Stevedoring Co.*, 223 F.3d 202, 204 (3d Cir. 2000). In deciding a motion for summary judgment, a court must construe all facts and inferences in the light most favorable to the nonmoving party. *See Boyle v. Cty. of Allegheny Pa.*, 139 F.3d 386, 393 (3d Cir. 1998). The moving party bears the burden of establishing that no genuine issue of material fact remains. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). "[W]ith respect to an issue on which the nonmoving party bears the burden of proof . . . the burden on the moving party may be discharged by 'showing'—that is, pointing out to

the district court—that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325.

Once the moving party has met that threshold burden, the non-moving party "must do more than simply show that there is some metaphysical doubt as to material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The opposing party must present actual evidence that creates a genuine issue as to a material fact for trial. *Anderson*, 477 U.S. at 248; *see also* Fed. R. Civ. P. 56(c) (setting forth the types of evidence on which a nonmoving party must rely to support its assertion that genuine issues of material fact exist). "[U]nsupported allegations . . . and pleadings are insufficient to repel summary judgment." *Schoch v. First Fid. Bancorp.*, 912 F.2d 654, 657 (3d Cir. 1990); *see also Gleason v. Norwest Mortg., Inc.*, 243 F.3d 130, 138 (3d Cir. 2001) ("A nonmoving party has created a genuine issue of material fact if it has provided sufficient evidence to allow a jury to find in its favor at trial."). If the nonmoving party has failed "to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial, . . . there can be 'no genuine issue of material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Katz v. Aetna Cas. & Sur. Co.*, 972 F.2d 53, 55 n.5 (3d Cir. 1992) (quoting *Celotex*, 477 U.S. at 322–23).

## III.    ANALYSIS

As to LTD benefits, the Plan Committees assert six main contentions: (1) Mr. McBurrows was not enrolled for LTD coverage at any time after 2006; (2) he first sought to enroll for LTD coverage while absent from work during a period of STD leave in 2013; (3) when he did seek to enroll in LTD coverage he did not submit the required evidence of insurability to MetLife; (4) if Mr. McBurrows had submitted evidence of insurability, MetLife would have determined that he was ineligible for LTD coverage due to his pre-existing health conditions; (5) he did not return to full-time work for a period of 90

consecutive days after his STD leave, which is a precondition for LTD coverage to take effect; and (6) he never paid the premiums necessary to maintain LTD coverage under the Plan. (DE 74-2 at 7, 16–17). Mr. McBurrows argues, *inter alia*, that he was not properly notified in 2007 when changes were made to his LTD coverage. (DE 79 at 18).

As to STD benefits, the Plan Committees assert that Mr. McBurrows received the maximum 52-week benefit period provided by the Plan and never administratively appealed with respect to the amount of STD benefits he was eligible to receive. (DE 74-2 at 7). Mr. McBurrows argues that he was harmed by the temporary suspension of his STD benefits in 2014 before they were reinstated and fully exhausted. (DE 79 at 35).

### A. Applicable ERISA Standard of Review

As a threshold issue, the parties dispute the applicable ERISA standard of review. The Plan Committees contend that because the "ERISA-regulated plan confers discretion on its administrators to interpret the terms of the Plan and determine eligibility for and entitlement to benefits," the Court ought to "review the claim determination under an arbitrary and capricious standard of review." (DE 74-2 at 18). The plaintiff argues for a less deferential standard of review. (DE 79 at 19–25).

When a plaintiff challenges an administrator's determination under an ERISA-governed employee benefit plan, the court will review that challenge under a *de novo* standard of review unless the plan itself gives the administrator discretionary authority to determine eligibility for benefits. In such a case, the court will apply an abuse-of-discretion[4] standard. *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115, 109 S. Ct. 948, 956, 103 L. Ed. 2d 80 (1989). The Third Circuit has helpfully explained that scheme:

---

[4]     The U.S. Court of Appeals for the Third Circuit has described the deferential standard of review used in the ERISA interchangeably as "arbitrary and capricious" or "abuse of discretion." *Howley v. Mellon Fin. Corp.*, 625 F.3d 788, 793 n.6 (3d Cir. 2010).

The Supreme Court has held that "a denial of benefits challenged under [ERISA] is to be reviewed under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989). If the plan gives the administrator or fiduciary discretionary authority to make eligibility determinations, we review its decisions under an abuse-of-discretion (or arbitrary and capricious) standard. *Metro. Life Ins. Co. v. Glenn, 554 U.S. 105, 111, 128 S.* Ct. 2343, 171 L.Ed.2d 299 (2008); *Doroshow v. Hartford Life & Accident Ins. Co.*, 574 F.3d 230, 233 (3d Cir. 2009). "Whether a plan administrator's exercise of power is mandatory or discretionary depends upon the terms of the plan." *Luby v. Teamsters Health, Welfare, & Pension Trust Funds*, 944 F.2d 1176, 1180 (3d Cir. 1991). There are no "magic words" determining the scope of judicial review of decisions to deny benefits, and discretionary powers may be granted expressly or implicitly. *Id.* However, when a plan is ambiguous, it is construed in favor of the insured. *Heasley*, 2 F.3d at 1258. "The plan administrator bears the burden of proving that the arbitrary and capricious standard of review applies." *Kinstler v. First Reliance Std. Life Ins. Co.*, 181 F.3d 243, 249 (2d Cir. 1999).

*Viera v. Life Ins. Co. of N. Am.*, 642 F.3d 407, 414 (3d Cir. 2011) (footnote omitted).

Here, the Plan Committees have met their burden of showing that the arbitrary and capricious standard of review applies because the Plan unambiguously confers discretionary authority to the administrators. The Plan expressly provides that VCRC shall have discretionary authority with respect to enrollment and eligibility claims and appeals:

### The claims administrator and its authority to review claims

The Verizon Employee Benefits Committee (VEBC) has delegated its authority to finally determine claims to the Verizon Claims Review Committee (VCRC). In some cases, the VCRC will delegate the authority to finally determine claims to certain other organizations on behalf of Verizon. Benefits under the disability income protection program are paid only if the VEBC, or its delegate, decides in its discretion that the applicant is entitled to them.

The claims administrator has:

- The authority to make final determinations regarding eligibility and benefit claims under the disability income protection program.

- Discretionary authority to:

- Interpret the disability income protection program based on provisions and applicable law and make factual determinations about claims arising under the disability income protection program.

- Determine whether a claimant is eligible for benefits.

- Decide the amount, form and timing of benefits.

- Resolve any other matter under the disability income protection program that is raised by a participant or a beneficiary or that is identified by the claims administrator.

In case of an appeal, the claims administrator's decisions are final and binding on all parties to the full extent permitted under applicable law, unless the participant or beneficiary later proves that the claims administrator's decision was an abuse of administrator discretion.

(DE 74-3 at 47–48; DE 75 ¶ 5; DE 79-1 ¶ 5).

Moreover, the Plan explains that before a Verizon employee can bring an action "at law or in equity to recover plan benefits," that employee must exhaust the appeals process laid out in the Plan. (DE 74-3 at 50; DE 75 ¶ 6; DE 79-1 ¶ 6). "[T]he Claims Review Committee is authorized to finally determine eligibility appeals and interpret the terms of the plan in its sole discretion. All decisions by the Claims Review Committee are final and binding on all parties." (Id.).

That Plan language unambiguously gives the Plan Committees discretionary authority. I therefore will apply the arbitrary and capricious (or abuse of discretion) standard of review. *Viera*, 642 F.3d 407, 414. Under that standard, "a court may overturn a decision of the Plan administrator only if it is without reason, unsupported by the evidence or erroneous as a matter of law." *Cottillion v. United Ref. Co.*, 781 F.3d 47, 55 (3d Cir. 2015) (internal quotation and citation omitted). "A decision is supported by substantial evidence if there is sufficient evidence for a reasonable person to agree with the decision." *Courson v. Bert Bell NFL Player Ret. Plan*, 214 F.3d 136, 142 (3d Cir. 2000) (noting that under abuse of discretion standard of review in ERISA cases, an administrator's interpretation of a plan may only be disturbed if it is without reason, unsupported by substantial evidence, or erroneous as a matter

of law). Even under this standard "an administrator's 'interpretation may not controvert the plain language of the document.'" *Cottillion*, 781 F.3d 47, 55 (quoting *Dewitt v. Penn–Del Directory Corp.*, 106 F.3d 514, 520 (3d Cir.1997)).

I must therefore determine whether there was a reasonable basis for the administrator's determinations, based on the terms of the Plan and the relevant facts. *Duda v. Standard Ins. Co.*, 649 F. App'x 230, 234 (3d Cir. 2016).

### B. Analysis of LTD Claim Determination

I find that the Plan Committees did not abuse their discretion in determining that Mr. McBurrows was not entitled to LTD benefits under the Plan. In short, the Plan Committees reasonably construed the Plan when determining that Mr. McBurrows did not meet certain preconditions for obtaining LTD coverage.

Mr. McBurrows sought to enroll in LTD coverage in 2013 while he was absent from work during a period of STD leave. He did not have LTD coverage in 2013, nor in the immediate six years preceding 2013, and was hoping to attain LTD coverage for 2014. (DE 74-30 at 57–58; DE 79-2 at 8–9; DE 74-12 at 76; DE 75 ¶ 21; DE 79-1 ¶ 21; DE 74-26 at 40).

Under those circumstances, the Plan required Mr. McBurrows to take certain steps to obtain LTD coverage. To be eligible for LTD coverage, the Plan required Mr. McBurrows to actively enroll. (DE 74-3 at 27–30; DE 75 ¶¶ 2, 3; DE 79-1 ¶¶ 2, 3). Since Mr. McBurrows was attempting to enroll in 2013 during his annual enrollment the Plan required him "to provide evidence of insurability to MetLife, and that evidence must be accepted, before coverage can take effect."[5] (*Id.*). The Plan Committees contend that Mr. McBurrows did not provide evidence of insurability, and nothing in the record indicates that he did provide evidence of insurability. (DE 74-12 at 76; DE 75 ¶ 21; DE 79-1 ¶ 21; DE 75 ¶¶ 1, 14, 21; DE 79-1 ¶¶ 1, 14, 21). When he attempted to enroll in LTD coverage in 2013, a confirmation statement issued, and that statement

---

[5]     An employee may enroll without providing such evidence during the first 31 days of employment.

indicates that he did not submit evidence of insurability at that time. (*Id.*). Plaintiff's counsel implicitly acknowledge that Mr. McBurrows never submitted evidence of insurability during the relevant period. (DE 75 ¶¶ 1, 14, 21; DE 79-1 ¶¶ 1, 14, 21).

In addition, the Plan specifically provides that if one enrolls in LTD coverage throughout the year or during any annual enrollment period, LTD "[c]overage begins on the first day you are actively at work that is on or after the day that your evidence of insurability is accepted." (DE 74-3 at 29). Since Mr. McBurrows never submitted any evidence of insurability, that evidence *a fortiori* was never "accepted." Consequently, LTD coverage for Mr. McBurrows never began.

Furthermore, the Plan expressly states that if one is receiving STD benefits when he or she enrolls for LTD coverage, that coverage cannot take effect until that person "actively return[s] to work on a full-time basis and [is] engaged continuously in the performance of [his or her] job for more than 90 consecutive days and provide[s] evidence of insurability." (DE 74-3 at 27–30; DE 75 ¶¶ 2, 3; DE 79-1 ¶¶ 2, 3). Mr. McBurrows returned to work after his STD leave on July 14, 2014 and was placed on unpaid personal leave on October 6, 2014—a period of less than 90 days. (2AC 1 ¶ 7; DE 16-2 at 16–17; DE 16-1 at 9). During the period when he had returned to work, he did not work full time but was working "shortened days" and was intermittently absent. (DE 16-2 at 16).

Additionally, Mr. McBurrows never paid any premiums for LTD coverage between 2007 and 2014. (DE 74-30 at 57–58; DE 79-2 at 8–9; DE 74-12 at 76; DE 75 ¶ 21; DE 79-1 ¶ 21). The Plan is clear that the Verizon employee "pay[s] the cost of LTD coverage through after-tax payroll deductions." (DE 74-3 at 27–30; DE 75 ¶¶ 2, 3; DE 79-1 ¶¶ 2, 3). Those contributions are based upon the employee's "annual benefits compensation as of July 1 of the previous calendar year and the LTD coverage option you choose." (*Id.*). If one happens to be on an approved leave of absence, that person is still "required to continue paying for [that person's] LTD premiums." (*Id.*). However, "[u]nder no circumstances will

your enrollment in the LTD plan take effect while you continue to be out on a short-term disability leave." (*Id.*). Consequently, because Mr. McBurrows did not pay any premiums for LTD coverage during the pertinent period, he did not actually purchase any LTD coverage. In short, the Plan prevents employees from adopting a wait-and-see attitude and enrolling for LTD coverage only after the onset of a disability giving rise to STD benefits.

These are multiple sufficient grounds for the Plan Committees to have determined that Mr. McBurrows was not enrolled in LTD coverage, and therefore was not entitled to LTD benefits. A reasonable person could find that their interpretation was consistent with the plain language of the Plan and the applicable evidence.[6] The Plan Committees did not abuse their discretion in their LTD claim determination.

Mr. McBurrows makes several arguments as to why he should nevertheless be entitled to LTD benefits. Those arguments are unpersuasive and do not suffice to overcome the abuse of discretion standard.

First, plaintiff argues that the Plan Committees had a conflict of interest because they work for Verizon and are therefore inclined to reach a "self-serving result." (DE 79 at 24–25). It is true that a court must evaluate any potential conflict of interest "'as a factor in determining whether the plan administrator has abused its discretion in denying benefits.'" *Baker v. Hartford Life Ins. Co.*, 440 F. App'x 66, 68 (3d Cir. 2011) (quoting *Metro. Life Ins. Co. v. Glenn,* 554 U.S. 105, 108, 128 S.Ct. 2343, 171 L.Ed.2d 299 (2008)).

I do consider this factor. Nonetheless, I find no evidence of suspect decision making. The Plan Committees' determination appears on its face to be a reasonable application of the Plan terms to the evidence. *Courson,* 214 F.3d 136, 142; *Dewitt,* 106 F.3d 514, 520 ("We must uphold a plan interpretation

---

6    Because I hold that the Plan Committees' determination regarding LTD benefits was not an abuse of discretion as outlined in this subsection, I do not reach the Plan Committees' separate argument that had Mr. McBurrows actually submitted evidence of insurability in 2013 or 2014 it would not have been accepted by MetLife because a truthful submission would have revealed Mr. McBurrows's pre-existing medical condition. (DE 74-2 at 26; DE 82 at 5).

even if we disagree with it, so long as the administrator's interpretation is rationally related to a valid plan purpose and is not contrary to the plain language of the plan."); *Howley v. Mellon Fin. Corp.*, 625 F.3d 788, 793 (3d Cir. 2010) ("[A] conflict of interest does not alter the standard of review" but rather "is merely one factor to be considered in evaluating" whether the plan administrator's decision "actually constituted an abuse of discretion.").

Second, Mr. McBurrows contends that in 2007 he was not provided with proper notice of a change to his LTD coverage or LTD premium payments. (DE 79 at 29). Starting in 2007, LTD coverage at Verizon, apparently for the first time, "became subject to employee-paid premiums." (DE 74-8 at 13; DE 75 ¶ 22). According to Mr. McBurrows' affidavit, he personally does not recall being notified about this 2007 change. (DE 79 at 29; DE 79-2 at 4-6).

The Plan Committees argue that the employee benefit plan is the means of informing participants and beneficiaries of the terms of their plan and its benefits. (DE 82 at 9). They contend that Mr. McBurrows was provided with the Plan documents and annual enrollment confirmation of coverage, which sets forth the requirements for coverage. (*Id.* at 9–10). Moreover, Mr. McBurrows affirmatively elected to not "pay the premiums necessary to maintain LTD coverage for approximately seven years, and first sought to apply for LTD coverage while receiving STD benefits." (*Id.* at 14).

Plaintiff cites *Lettrich v. J.C. Penney Co.*, 213 F.3d 765 (3d Cir. 2000). In *Lettrich*, a former employee, Joseph Lettrich, brought an ERISA action against his former employer, J.C. Penney Co., to recover damages under a severance pay program. *Lettrich*, 213 F.3d 765. In 1988, J.C. Penney adopted a separation pay program which provided a lump-sum severance payment if an eligible employee was terminated within two years of a corporate consolidation. The separation program specified that it would continue for a term of five years and then automatically renew for another five-year term unless cancelled by the board of directors. This program was broadly advertised to eligible employees. *Id.*

Five years later, in 1992, the J.C. Penney board of directors terminated the program. *Id.* at 766. However, the company only notified participants of this change by including it in the middle of the 61-page Notice of Shareholders Meeting and Proxy Statement for 1993, which was mailed to all eligible employees. *Id.* In 1997, Lettrich resigned when J.C. Penney cut his pay in the wake of a corporate acquisition. *Id.* at 768. Lettrich then sought a lump-sum payment under the severance pay program, but J.C. Penney denied his request on the ground that it had discontinued the program four years earlier. Lettrich argued that he was unaware of the termination of the program because J.C. Penney concealed the notification in the 1993 notice of shareholders meeting and otherwise failed to notify him of a material change to his welfare benefits. *Id.* The district court granted summary judgment in favor of J.C. Penney.

On appeal, the Third Circuit reversed, finding that there were factual issues sufficient to defeat summary judgment. It evaluated the requirement under ERISA that an employer notify participants of a material change in a welfare plan. *Id.* In reversing the grant of summary judgment due to factual issues over whether the notice requirement was met, the Third Circuit reasoned that a fact finder "could conclude that a 2 or 3 paragraph notice of termination of a welfare benefit which. . . was buried in the middle of a 61-page notice of a shareholders meeting with nothing in the exterior to call it to the attention of the participants does not satisfy the requirement." *Id.* at 770. However, the court noted that it did not intend to "suggest that the circumstances of this case compel a finding of active concealment sufficient to void the termination of the separation pay program to Lettrich" and did not imply that an inference of bad faith may be drawn simply from a failure to comply with ERISA's reporting and disclosure requirements. *Id.* at 773.

Here, there are significant differences between Mr. McBurrows's situation and the one presented in *Lettrich*. The terms for LTD coverage were presented unambiguously in the Plan itself, which explicitly noted that one "must enroll in the LTD plan in order to be eligible for LTD coverage." (DE 74-3 at 27). *See In*

18

re *Unisys Corp. Retiree Med. Ben. ERISA Litig.*, 58 F.3d 896, 902 (3d Cir. 1995) (noting that the employee benefit plan is the "statutorily established means of informing participants and beneficiaries of the terms of their plan and its benefits."). Each year subsequent to 2006, Mr. McBurrows was provided annual enrollment materials that confirmed his prior coverage and directed him to review his benefits. (DE 74-27 at 66). He did not elect to have LTD coverage for the seven years subsequent to 2006. (DE 74-30 at 57–58; DE 79-2 at 8–9; DE 74-12 at 76). Moreover, Verizon records indicate that Mr. McBurrows had access to and regularly viewed Verizon's BenefitsConnection website, which made available to him the Plan documents and the benefits he maintained while employed. (DE 74-30 at 49–54).

Additionally, "a procedural defect in notice does not give rise to a substantive remedy" even though "there are situations, usually presenting extraordinary circumstances, where the remedy of striking a plan amendment may be available." *Lettrich*, 213 F.3d 765, 771 (3d Cir. 2000) (citing *Ackerman v. Warnaco, Inc.,* 55 F.3d 117, 125 (3d Cir.1995)). "Such circumstances include situations where the employer has acted in bad faith, or has actively concealed a change in the benefit plan, and the covered employees have been substantively harmed by virtue of the employer's actions." *Ackerman*, 55 F.3d 117, 125. Here, there is no indication of active concealment or bad faith that may amount to the type of "extraordinary circumstances" necessary to invalidate a change to a plan. *See Roarty v. Tyco Int'l Ltd. Grp. Bus. Travel Acc. Ins. Plan*, 386 F. App'x 329, 333 (3d Cir. 2010) (citing *Lettrich*, 213 F.3d 765, 770); *Jordan v. Fed. Exp. Corp.*, 116 F.3d 1005, 1011 (3d Cir. 1997) (affirming dismissal of ERISA disclosure claim when plaintiff "presented no evidence that [employer] acted in bad faith" and therefore "failed to establish the requisite 'extraordinary circumstances'"). To the contrary, the plain language of the Plan itself provided Mr. McBurrows with a detailed explanation of his LTD coverage

options, which make clear that he would be required to elect to be covered and pay premiums.[7]

Finally, Mr. McBurrows argues that defendants have not adequately explained the supposed error in the June 5, 2015 letter where MetLife wrote that Mr. McBurrows's LTD coverage ceased in January 2011, as opposed to 2007. (DE 74-29 at 42; DE 75 ¶ 13; DE 79-1 ¶ 13; DE 79 at 32). That issue is not material to the question of whether Mr. McBurrows had LTD coverage in 2013 and thereafter. Moreover, Mr. McBurrows has not presented any additional evidence or reasons to suggest that January 2011 is the correct coverage expiration date, whereas the Plan Committees have proffered sufficient evidence that this was simply an error, because Mr. McBurrows did not have LTD coverage from 2007 onward.

Summary judgment is therefore granted in the Plan Committees' favor on the claims for LTD benefits.

### C. Analysis of STD Claim

I will also grant defendants' motion for summary judgment as to Mr. McBurrows' claim for STD benefits. Mr. McBurrows received the full amount of STD benefits available to him under the Plan. (DE 75 ¶¶ 8–12; DE 79-1 ¶¶ 8–12; DE 74-26 at 28, 40; DE 74-29 at 42). The parties do not dispute this. (DE 82 at 5; DE 79 at 35). Plaintiff has not put forward any valid basis why he ought to be due more STD benefits than was allowable in the Plan.

The Plan Committees contend in addition that Mr. McBurrows has not exhausted his administrative appeals with respect to his claim for STD benefits. Mr. McBurrows responds that the exhaustion defense does not apply because resort to the administrative appeal process would have been futile. (DE 79 at 34 ("[A]dministrative remedies were exhausted and reached a point of futility when they were denied.")).

---

[7]    I do not reach the Plan Committees separate response to Mr. McBurrows' notice argument that Mr. McBurrows did not raise the notice issue during his administrative appeal. (DE 82 at 9–10).

While Mr. McBurrows likely exhausted his appeals as to LTD coverage, he did not adequately exhaust his appeals with respect to STD coverage. *See Harrow v. Prudential Ins. Co. of Am.*, 279 F.3d 244, 249 (3d Cir. 2002). Mr. McBurrows was provided the full amount of STD coverage as provided by the Plan, which expressly designated a maximum STD benefit period of 52 weeks. (DE 75 ¶ 8; DE 79-1 ¶ 8). When Mr. McBurrows' counsel appealed his suspension of STD benefits, he did not appeal or otherwise contest the amount of the monthly STD benefits he had previously received or was eligible to receive, but instead appealed the aspect that prevented him from obtaining the full 52 weeks of coverage. (DE 75 ¶ 10; DE 79-1 ¶ 10). His counsel was successful in reinstating his STD benefits and he received the maximum period of benefits for the full 52 weeks. He has not otherwise appealed his STD benefits with respect to the dollar amount of benefits he received. Furthermore, he has not meaningfully asserted here that any of the pertinent factors that could excuse exhaustion on futility grounds apply and I see no reason why they would. *See Harrow*, 279 F.3d 244, 249–50. Consequently, the Plan Committees are correct in asserting the exhaustion defense as to the claim for STD benefits.

More fundamentally, Mr. McBurrows does not appear to be challenging in earnest the amount of STD coverage he received. (DE 79 at 35). Rather, he takes issue with the fact that his STD coverage was temporarily suspended in May 2014 and then reinstated in February 2015 after intervention by his attorneys. (DE 79 at 35 ("The purpose of this Brief is not to challenge the rate at which the plaintiff was paid short term disability. . . .[T]he STD issues should go into evidence in the case as probative of the entire course of dealing between the parties even if it is ultimately found that there is no basis to award further economic benefits or damages from the STD cutoff alone."); DE 75 ¶¶ 9, 11, 12; DE 79-1 ¶¶ 9, 11, 12; DE 74-26 at 28). The main grievance appears to be that having his STD benefits suspended and then reinstated was an inconvenience to him when he was suffering from his medical ailments. (DE 79

at 35 ("Leon McBurrows was not in a position to be led [on] a merry chase by claims representatives after suffering a stroke on his job site in this matter.")).

I agree that it is maddening and draining to deal with benefits bureaucracies when one is most vulnerable and ill. That systemic grievance, however, is not a basis for an ERISA claim like the one asserted here. *See* 29 U.S.C. § 1132(a)(1)(B) ("A civil action may be brought by a participant or beneficiary. . . to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan."); *Harrow*, 279 F.3d 244, 249. Mr. McBurrows fortunately was able to obtain reinstatement of his STD benefits within a period of months, and he in fact received the maximum STD benefit available under his Plan.

Overall, Mr. McBurrows does not make a sufficient showing that he is due more STD benefits. Therefore, I will grant the Plan Committees' summary judgment motion as to Mr. McBurrows' claim for STD benefits.

## IV. CONCLUSION

For the reasons stated above, the Plan Committees' motion for summary judgment is GRANTED. An appropriate order follows.

Dated: June 11, 2019

KEVIN MCNULTY, U.S.D.J.